UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

RDK CORP.,

          Plaintiff,

       v.                            Case No. 02-C-0675

LARSEN BAKERY, INC.,

          Defendant.

DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

       RDK Corp. sues Larsen Bakery, Inc. for trademark infringement and unfair competition under federal and Wisconsin state law. The allegedly infringing item is Larsen Bakery's domain name "racinekringle.com," relating to the Danish-style pastry, called "kringle," made in Racine, Wisconsin. RDK holds registered trademarks in RACINE DANISH KRINGLES and in RACINE DANISH KRINGLES ALWAYS THE BEST! with design. Moreover, RDK maintains that it holds a common law trademark in "Racine Kringle."[1]

       The complaint asserts five claims: (I) trademark infringement under 15 U.S.C. § 1114, (II) unfair competition under 15 U.S.C. § 1125(a), (III) infringement of a registered trademark under Wis. Stat. § 132.033, (IV) state common law trademark infringement along with unfair competition, and (V) violation of an earlier injunction. RDK now moves for summary judgment on counts I, II, IV and V. Count III is not implicated by the motion.

---

[1] In this Decision and Order, registered trademarks are referenced using all capital letters. Unregistered trademarks, about which the parties are litigating, are referenced using quotation marks. As one of the primary questions in this case is whether these are indeed trademarked terms, they are referenced differently than those terms that are unquestionably registered trademarks.

Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 (federal question) and 1338 (trademark and unfair competition). And, venue is proper in this district inasmuch as Larsen Bakery resides and is subject to personal jurisdiction here. *See* 28 U.S.C. § 1391(b), (c).

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case, showing that there is a genuine issue for trial. *Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a *genuine* issue of *material* fact for the motion to be denied. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). To establish that a question of fact is "genuine," the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201,

2

1205 (7th Cir. 1998). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

A plaintiff moving for summary judgment bears a greater initial burden than a defendant so moving; it must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant. *Select Creations, Inc. v. Paliafito Am., Inc.*, 911 F. Supp. 1130, 1149 (E.D. Wis. 1995) (Warren, J.); *see Anderson*, 477 U.S. at 248. Also, because of the factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

## UNDISPUTED FACTS

The following facts are undisputed, or, if a dispute exists, reflect the evidence favoring nonmovant Larsen Bakery.

RDK and Larsen Bakery are Wisconsin corporations headquartered in Racine, Wisconsin. (Pl.'s Proposed Findings of Fact (PPFOF) ¶¶ 2, 5.)

The history of "kringle" baking in Racine goes back to the time when many Danes settled in the area in the 1800's and early 1900's. (Def.'s Proposed Stmt. of Facts (DPSOF) ¶ 7; Hutchinson Decl. ¶ 7.) The immigrant Danish bakers continued to bake kringles in Racine, as they had in their native country, to such an extent that Racine sometimes has been called "Kringleville." (DPSOF ¶ 8; Hutchinson Decl. ¶ 8.) Over time, the kringles made in Racine have been modified by the immigrant Danish bakers. The "old country" kringles were pretzel shaped; the popular kringles now are oval shaped and include a wider variety of fruit and nut fillings. (DPSOF ¶ 10; Hutchinson Decl. ¶ 10.)

3

Kringles from Racine, Wisconsin, are well-known and sought-after; their fame extends beyond any particular bakery and includes Larsen Bakery. (DPSOF ¶¶ 6, 9; Hutchinson Decl. ¶¶ 6, 9.) Kringles from Racine are made and sold by Bendtsen's Bakery, Lehmann's Bakery, O&H Bakery, Larsen Bakery, and RDK. (DPSOF ¶ 9; Hutchinson Decl. ¶ 9.) Kringles from Racine are considered to be special and unique. (*Id.*)

National media, including television food shows, recognize and further the fame of kringles from Racine. Most of the Racine bakeries making kringles have been featured on television shows from time to time. (DPSOF ¶ 12; Hutchinson Decl. ¶ 12.) During the week of March 15, 2004, for instance, RDK was featured in a Food Network special television program related to the top five bakery blockbusters. The episode featured spokesperson Bobby Rivers and RDK's kringles and reached cable and satellite television viewers across the country. (PPFOF ¶¶ 42, 43; Heyer Decl. ¶ 18.[2]) Al Roker's show, "Roker on the Road: Regional Specialties," which aired June 22 and 25, 2004, featured a story about kringles from Racine and Larsen Bakery. (DPSOF ¶ 13; Hutchinson Decl. ¶ 13, Ex. 2.) Larsen Bakery has also been featured on "Discover Wisconsin" and "Baking with Father Dominic," on PBS. (DPSOF ¶ 14; Hutchinson Decl. ¶ 14.) In 2004, another television show featured Bendtsen Bakery's kringle. (*Id.*)

Public interest in Racine kringle is further shown in that Larsen Bakery has groups of tourists to see how it makes kringles. (DPSOF ¶ 15; Hutchinson Decl. ¶ 43.) Politicians coming to Racine also visit area kringle bakeries. (DPSOF ¶ 16; Hutchinson Decl.

---

[2]In response to these proposed findings of fact, Larsen Bakery says that it is not able to dispute or admit the facts without seeing the referenced program. As Larsen Bakery has not disputed these proposed findings of fact with evidence, they are deemed unopposed. *See* Civil L.R. 56.2(b)(1) (stating that a response to a contested finding of fact "must include specific citations to evidentiary materials in the record" to support a claim that the dispute exists).

¶ 15.)  RDK's owner, Michael Heyer, acknowledges that the Racine Convention and Visitor's Bureau promotes the connection between kringles and Racine.  (DPSOF ¶ 31; Bolton Aff. Ex. 4 at 31.)

Several recipe or travel books mention kringles in conjunction with Racine, Wisconsin.  (Bolton Aff. Exs. 7-12.[3])  In addition, several internet websites mention kringle together with Racine.  (Bolton Aff. Ex. 1.)  Futher, RDK's Heyer acknowledges that the public associates kringle with Racine.  (DPSOF ¶ 28; Bolton Aff. Ex. 4 at 8.)  Even RDK's promotional literature describes the historical relationship of Racine and kringle.  (DPSOF ¶ 27; Bolton Aff. Ex. 13 ("Today, kringle from Racine is still a magical creation, baked according to a heritage not equalled anywhere else in America.").)

The kringle associated with Racine differs from the product that the Danes have in Denmark, in part because the Racine-made kringle has an oval configuration rather than a pretzel shape and the Racine-made kringle has a wider variety of flavors.  (DPSOF ¶ 30; Bolton Aff. Ex. 4 at 11-12.)

Racine kringles make good gifts that can be ordered and shipped to friends and relatives around the country, although some are shipped for the direct personal consumption of the buyer.  (DPSOF ¶ 38; see Hutchinson Decl. ¶ 17.)  People who grew up in Racine, or who have visited Racine, or otherwise have had kringle from this area, order kringles for shipment and delivery to themselves or to friends or family members.  (DPSOF ¶ 39; Hutchinson Decl. ¶ 19.)

---

[3]RDK objects to use of excerpts from these books as hearsay.  However, the court is not using the books for the truth of the matters asserted – for instance, that Racine is the only place in the United States where kringle is made (Bolton Aff. Ex. 7 at 25) or that all ethnic bakeries in Racine are Danish (id. Ex. 8 at 12). Instead, excerpts from these books are used only to indicate the link between Racine and kringle in publications written by members of and available to the public.

RDK owns the mark RACINE DANISH KRINGLES as shown in U.S. Reg. No. 1,560,048, issued October 10, 1989, for use in connection with pastries.  (PPFOF ¶ 6; Himich Decl. filed 6/25/04 ¶ 4, Ex. A.)   The RACINE DANISH KRINGLES mark is incontestable pursuant to 15 U.S.C. § 1065 because Section 8 and 15 declarations have been accepted by the U.S. Patent and Trademark Office.  (PPFOF ¶ 7; Himich Decl. filed 6/25/04 ¶ 4, Ex. A.)  The certificate of registration states that RDK makes no claim to an exclusive right to use "Danish Kringles" apart from the full trademark.  (Himich Decl. filed 6/25/04 Ex. A.)  RDK (or its predecessor in interest) has used the mark RACINE DANISH KRINGLES in connection with the sale of pastries in interstate commerce since at least as early as September 1, 1981. (PPFOF ¶ 12; Heyer Decl. ¶ 3; Himich Decl. filed 6/25/04 Ex. A.)  The RACINE DANISH KRINGLES mark uses the words in sequence without emphasis on any of the specific words. (DPSOF ¶ 56; Bolton Aff. Ex. 4 at 20-21.)

Also, RDK owns the mark RACINE DANISH KRINGLES ALWAYS THE BEST! and Design as shown in U.S. Reg. No. 2,236,869, issued April 6, 1999, for use in connection with pastries, and as shown below.  (Himich Decl. filed 6/25/04 ¶ 5, Ex. B.)



A claim of distinctiveness is made in the registration with respect to the word mark portion "RACINE DANISH KRINGLES."  (PPFOF ¶ 10; Himich Decl. filed 6/25/04 ¶ 5, Ex. B.)  The trademark includes a distinctive design with the phrases "Racine Danish Kringles" and

Case 2:02-cv-00675-CNC    Filed 07/31/06    Page 6 of 40    Document 44

"Always the Best!," which language is always used in conjunction with the design used on packaging. (DPSOF ¶ 57; Bolton Aff. Ex. 4 at 21-22.) RDK's product labels always include the words RACINE DANISH KRINGLES with distinctive design. (DPSOF ¶ 58; Bolton Aff. Ex. 4 at 16, 23.) The certificate of registration indicates that RDK disclaims any exclusive right to "Danish Kringles" apart from the mark as shown in the design. (Himich Decl. field 6/25/04 Ex. B.)

As shown above, the mark with design features the words "Racine" and "Kringles" in larger type than the word "Danish." (*See id.*) However, RDK never uses just the phrase "Racine Kringles" on any of its packaging. (DPSOF ¶ 59; Bolton Aff. Ex. 4 at 70-71.) RDK does not refer to itself in any printed material or advertising as "Racine Kringle." (DPSOF ¶ 60; Bolton Aff. Ex. 4 at 24-25.) Moreover, RDK does not use just the two words "Racine Danish" on any product packaging or written material. (DPSOF ¶ 62; Bolton Aff. Ex. 4 at 72.)

As a result of continuous sales, advertisement and promotion of its pastry for so many years under the two trademarks described above, RDK has established significant goodwill and association with these marks and the products with which the marks are used. (PPFOF ¶ 13; Heyer Decl. ¶ 8; *see* Bolton Aff. Ex. 4 at 23-24.) These two marks of RDK are distinctive, and not descriptive, and their trademark significance is established not only as acknowledged by the U.S. Patent and Trademark Office through the issuance of two federal trademark registrations, but also as each has come to indicate and stand for the source of pastry goods made and sold by RDK. (PPFOF ¶ 14; Heyer Decl. ¶ 9; Bolton Aff. Ex. 4 at 23-24.)

RDK does not have a retail outlet. (Bolton Aff. Ex. 4 at 33.) Its business is primarily wholesale (Hutchinson Decl. ¶ 31.) RDK advertises and promotes its two registered marks and its products in magazines, radio and television advertisements, store displays and signs, brochures, and the internet; the registered marks have been displayed prominently in such advertising and promotion. (PPFOF ¶ 15; Heyer Decl. ¶ 10; Bolton Aff. Ex. 4 at 23-24.) As an example, RDK features the mark RACINE DANISH KRINGLES on labels used on the products. (PPFOF ¶ 16; Heyer Decl. ¶ 10.) Moreover, RDK advertises products with these trademarks in various Wisconsin-related tourism guides and magazines. (PPFOF ¶ 17; Heyer Decl. ¶ 10.) It publishes and distributes brochures featuring these two marks and its other products throughout the country and publishes materials bearing these two marks for presentation to potential distributors. (PPFOF ¶¶ 18, 19; Heyer Decl. ¶ 10.)

RDK's products bearing these trademarks are featured in supermarkets and promoted at trade shows and through fundraisers. (PPFOF ¶¶ 20-22; Heyer Decl. ¶ 10.) RDK's products with these trademarks have been featured at fast food restaurants, in specialty food stores and magazines featuring specialty foods, and in consumer direct mailing inserts. (PPFOF ¶¶ 23-25; Heyer Decl. ¶ 10.)

RDK spent over $1.1 million advertising and promoting the mark RACINE DANISH KRINGLES in connection with pastries between 1993 and 2004, with almost $500,000 being spent between 2000 and 2004. (PPFOF ¶¶ 26, 27; Heyer Decl. ¶ 12.) From 1993 to 2004, RDK enjoyed nearly $30 million in sales from pastries sold under the mark RACINE DANISH KRINGLES, with nearly $14 million of such sales occurring between 2000 and 2004. (PPFOF ¶¶ 28, 29; Heyer Decl. ¶ 13.)

8

Through the mail, RDK distributes catalogs, brochures and fundraising materials touting its trademarked products to customers and prospective customers around the country. (PPFOF ¶ 37; Heyer Decl. ¶ 16.)  Using these materials, customers place orders via mail, facsimile, or telephone.  (PPFOF ¶ 38; Heyer Decl. ¶ 16.)  RDK enjoys repeat business as well as new business.  (PPFOF ¶ 39; Heyer Decl. ¶ 17.)

To sell its RACINE DANISH KRINGLES pastry products, RDK began operation of a website, kringle.com, in January 2001.  (PPFOF ¶ 32; Heyer Decl. ¶ 15.)  Over that website, RDK's customers may place orders directly for RDK pastry products using major credit cards.  (PPFOF ¶ 33; Heyer Decl. 15.)  The website also allows RDK customers to download order forms, which they can use to place orders via mail, facsimile, or telephone. (PPFOF ¶ 34; Heyer Decl. ¶ 15.)  The website also displays information regarding fundraising promotional programs sponsored by RDK using the RACINE DANISH KRINGLES mark. (PPFOF ¶ 36; Heyer Decl. ¶ 15.)

Products bearing the mark RACINE DANISH KRINGLES have been shipped by RDK to many locations in the United States.  (PPFOF ¶¶ 35, 72; Heyer Decl. ¶ 15.)  And, over the years, RDK has received critical acclaim in newspapers, magazines and other periodicals for its trademarked pastry products.  (PPFOF ¶ 41; Heyer Decl. ¶ 18.)

RDK is not an "old time" kringle bakery in the Racine area; it is a relative newcomer.  (DPSOF ¶ 88; Hutchinson Decl. ¶ 32.)  Disagreement exists among the kringle bakeries as to who makes the best kringle in Racine.  (DPSOF ¶¶ 88, 89; Hutchinson Decl.

¶¶ 32, 33; Bolton Aff. Ex. 4 at 32.)  The question of who makes the best kringle in Racine has been the subject of friendly area competitions.  (DPSOF ¶ 90; Hutchinson Decl. ¶ 34.[4])

Don Hutchinson is the president of Larsen Bakery.  (DPSOF ¶ 1; Hutchinson Decl. ¶ 1.)  Hutchinson's father and mother purchased Larsen Bakery as a going concern in 1969 from Heiner Larsen, and the Hutchinson family has run the business to the present.  (DPSOF ¶¶ 2, 3; Hutchinson Decl. ¶¶ 2, 3.)  They continue the tradition of baking the area's distinctive kringle, which they inherited from the bakers who preceded them at Larsen Bakery.  (DPSOF ¶ 68; Hutchinson Decl. ¶ 70.)

Larsen Bakery is a full-service bakery, selling a variety of products in addition to kringle, including cakes, bread, and doughnuts.  (PPFOF ¶ 85; Himich Decl. filed 6/25/04 Ex. E at 13-14.)  Sales of kringle constitute slightly more than fifty percent of Larsen Bakery's sales.  (PPFOF ¶ 86; DPSOF ¶ 5; Hutchinson Decl. ¶ 5; Himich Decl. filed 6/25/04, Ex. E at 78.)  The bulk of Larsen Bakery's business is done through its retail store on Washington Avenue in Racine.  (DPSOF ¶ 4; Hutchinson Decl. ¶ 4.)

Widespread use of the internet has made it easier for customers to order kringles for shipment and delivery to various locations without physically coming to Larsen Bakery's retail store.  (DPSOF ¶ 40; Hutchinson Decl. ¶ 20.)  Therefore, like most businesses, Larsen Bakery now has a website that allows customers to purchase kringle online.  (DPSOF ¶ 41; Hutchinson Decl. ¶ 22.)

---

[4]RDK objects to this proposed finding of fact, asserting that Hutchinson is not competent to testify as to contests regarding the quality of area products.  (Pl.'s Resp. to Def.'s Proposed Stmt. of Facts ¶ 90.)  But as owner of Larsen Bakery, it appears Hutchinson would have personal knowledge of such competitions.  In addition, RDK's Heyer also alludes to friendly competition among the Racine bakeries regarding the best kringle.  (Bolton Aff. Ex. 4 at 32.)

On or about September 14, 2000, Patrick Flynn and/or Advantage Promotion LLC and/or RacineOnLine.com obtained a domain name registration for the domain name racinekringle.com from BulkRegister.com, a domain name registrar. (PPFOF ¶ 44; Himich Decl. filed 6/25/04 ¶¶ 6, 7, Ex. C at ADV 0121.) Although Flynn initially registered the domain name in his own name (Himich Aff. filed 6/25/04 Ex. E, Ex. 5), the domain name was registered for Larsen Bakery (Hutchinson Decl. ¶¶ 28, 61-63, Ex. 6; *see* Himich Decl. filed 6/25/04 Ex. C at ADV 0121). "Racinekringle.com" was not previously registered by Flynn for his own account or otherwise. (DPSOF ¶ 79; Hutchinson Decl. ¶¶ 28, 61-63; *see id.* Ex. 6; Bolton Aff. Ex. 4 at 55.)[5] Flynn pointed out to Larsen Bakery that the domain name kringle.com was owned by RDK. (PPFOF ¶ 47; Himich Decl. filed 6/25/04 ¶¶ 6, 12, Ex. C at ADV 0382, Ex. I at LB 00255.)

Flynn designed the Larsen Bakery website and set up what Larsen Bakery needed to go online. (DPSOF ¶ 74; Hutchinson Decl. ¶ 24.) Larsen Bakery chose the domain name "racinekringle.com" because of its connection to the community and the famous kringles that the area bakers, including Larsen Bakery, sold. (DPSOF ¶ 76; Hutchinson Decl. ¶ 26.[6]) Flynn began web hosting for Larsen Bakery at the internet address racinekringle.com

---

[5]In its proposed findings of fact, RDK asserted that Flynn offered the domain names racinekringle.com and racinedanishkringle.com for sale or leased the name to Larsen Bakery. (PPFOF ¶¶ 45, 46, 48.) But the evidence to support these proposed findings does not necessarily establish that racinekringle.com was actually advertised for sale or leased. (*See* Himich Aff. Ex. C at ADV 175, ADV287, ADV0381-82.) Instead, they suggest only that Flynn was going to register racinekringle.com. (*See id.* at ADV 381.) Larsen Bakery provides evidence that Flynn registered racinekringle.com for Larsen Bakery's benefit rather than selling or leasing the domain name to Larsen Bakery, and as the nonmovant, Larsen Bakery gets the benefit of any dispute regarding this evidence.

[6]RDK disputes this proposed finding of fact, contending that Larsen Bakery chose the name for the website based on the recommendation from Flynn and Flynn has admitted registering the domain name without good faith. (Pl.'s Resp. to Def.'s Proposed Stmt. of Facts ¶ 76.) However, the court must take the evidence in Larsen Bakery's favor at the summary judgment stage, and Hutchinson has provided the reason set forth above.

in or about November 2000.  (PPFOF ¶ 55; *see* Himich Decl. filed 6/25/04 ¶ 8, Ex. E at 22-23; Hutchinson Decl. Ex. 6.)

Larsen Bakery paid an initial registration fee and a later renewal fee for the domain name; Larsen Bakery also paid a site hosting fee to Flynn and paid Flynn for his website design services in creating the site.  (DPSOF ¶ 84; Hutchinson Decl. ¶ 60, Ex. 6.) Larsen Bakery did not purchase the domain name "racinekringle.com" from Flynn separately, and it had Flynn register the name to Larsen Bakery.  (DPSOF ¶ 85; Hutchinson Decl. ¶ 61.) Flynn only offered to register the name for Larsen Bakery, which he did as part of his services for designing and hosting the website.  (DPSOF ¶ 86; Hutchinson Decl. ¶ 62.)

On or about May 2, 2001, Flynn amended BulkRegister.com's administrative contacts and ownership information for the domain name racinekringle.com to reflect ownership by Donald Hutchinson of Larsen Bakery, Inc.  (PPFOF ¶ 50; *see* Himich Decl. filed 6/25/04 ¶ 6, Ex. C at ADV 0121.)

On May 23, 2001, RDK sued Patrick Flynn and Flynn's company Advantage Promotions, LLC, which was doing business as RacineOnline.com, in this district, alleging trademark infringement under federal, state, and common law.  The case, captioned *RDK Corp. v. Flynn*, No. 01-C-530 (the "*Flynn* case"), was assigned to Magistrate Judge William E. Callahan.  (PPFOF ¶ 51; Himich Decl. filed 6/25/04 ¶ 9, Ex. F.)  On June 5, 2002, a stipulated judgment was entered in that case, providing that (1) RDK is the sole and exclusive owner of the marks RACINE DANISH KRINGLES, RACINE DANISH KRINGLES ALWAYS THE BEST and Design, "Racine Kringles," and "Racine Danish" ("RDK's Judgment Marks"), all as used with the goods of pastries; that Registration No. 1,560,048 is valid, enforceable and incontestable and Registration No. 2,236,869 is valid and enforceable; (2) RDK has

12

established secondary meaning and enforceable common law trademark rights in its "Racine Kringles" and "Racine Danish" marks "through long, continuous, and substantially exclusive use of those marks"; (3) the domain names racinekringle.com; racinedanishkringle.com; and racinedanish.com (the "Judgment Domain Names") are each confusingly similar to RDK's Judgment Marks and that RDK's Judgment Marks were distinctive at the time the Judgment Domain Names were registered; (4) use of the Judgment Domain Names constitutes use in commerce of a mark or false designation of origin that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of third parties with RDK as to the origin, sponsorship or approval of the third parties' goods or commercial activities by RDK; and (5) such use of the Judgment Domain Names constitutes a violation of the Lanham Act, 15 U.S.C. § 1051, and counterfeit use of a mark that is identical to RDK's mark RACINE DANISH KRINGLES in violation of Chapter 132 of the Wisconsin Statutes. (PPFOF ¶ 52; Himich Decl. filed 6/25/04, ¶ 7, Ex. D.) The stipulated judgment included a permanent injunction enjoining Advantage Promotions, LLC and "its officers, agents, sales representatives, servants, employees, associates, successors, and assigns and all persons acting under their control, by, through, under, or in active concert or in participation" (Himich Decl. filed 6/25/04 Ex. D ¶ 16) with Advantage Promotions from, among other things, using "any mark having a word or formative confusingly similar to . . . RDK['s] [Judgment] Marks" (*id*.), and hosting or serving as administrative contact for any website using one of the Judgment Domain Names. The stipulated judgment directed Advantage Promotions to resign from hosting any such website and to transfer to RDK any rights it possessed in the Judgment Domain Names. (*Id.* ¶¶ 16, 17; *see* PPFOF ¶ 53.)

13

Larsen Bakery learned in 2001 that RDK was accusing Flynn and his business of violating RDK's trademarks. (DPSOF ¶ 72; Hutchinson Decl. ¶ 47.) Larsen Bakery knew of the dispute that formed the basis of the *Flynn* case. (PPFOF ¶ 54; Himich Decl ¶ 11, Ex. G ¶ 1, Ex. E at 83.) On February 22, 2001, Flynn and Larsen Bakery's Hutchinson met for dinner. (PPFOF ¶ 56; Himich Decl ¶ 8, Ex. E at 83-84, Ex.6.) Flynn told Hutchinson about the *Flynn* case, including RDK's settlement demands. (PPFOF ¶ 57; Himich Decl. filed 6/25/04 ¶¶ 8, 11, *see* Ex. E at 23, 83-84, 98, Ex. G.) Flynn invited Larsen Bakery to join in the *Flynn* case. (PPFOF ¶ 58; Himich Decl. filed 6/25/04 ¶ 8, Ex. E at 25.) Larsen Bakery declined and chose not to assist Flynn in the *Flynn* case. (PPFOF ¶ 60; Himich Decl. filed 6/25/04 ¶ 8, Ex. E at 25, 106-07.) Larsen Bakery did not consider it prudent to jump into a lawsuit that did not name it as a defendant; further, it understood that Flynn could not transfer the domain name to RDK, as it was registered for Larsen Bakery. (DPSOF ¶¶ 100, 102; Hutchinson Decl. ¶¶ 48, 49; Himich Decl. filed 6/25/04 Ex. E at 25.) Hutchinson and his father discussed RDK's lawsuit against Flynn and decided that Larsen Bakery would not do anything unless a lawsuit was filed against it. (DPSOF ¶ 101; Himich Decl. filed 6/25/04 Ex. E at 25, 86, 90.) Larsen Bakery threatened Flynn with legal action if the settlement of Flynn's dispute with RDK affected Larsen Bakery's beneficial rights to the domain name racinekringle.com. (PPFOF ¶ 61; Himich Decl. filed 6/25/04 ¶ 8, Ex. E at 38-39, Ex. 10.)

Larsen Bakery was not named as a party in the *Flynn* case. (DPSOF ¶ 100; Himich Decl. filed 6/25/04 Ex. E; 01-C-530 docket (E.D. Wis.).) RDK deliberately did not name Larsen Bakery in the *Flynn* lawsuit to avoid a direct dispute with other bakers. (DPSOF ¶ 104; Bolton Aff. Ex. 4 at 83, 89.) RDK tried to minimize conflict with the other bakers because RDK was "the new kid on the block in Racine," trying to build a business, and RDK

14

was trying to put its case before the other bakers in a more friendly way than what was being portrayed in the media. (DPSOF ¶ 105; Bolton Aff. Ex. 4 at 101.)

Larsen Bakery owned the domain name "racinekringle.com" before RDK filed the *Flynn* case. (DPSOF ¶ 81; *see* Bolton Aff., Ex. 18.) Further, the domain name "racinekringle.com" was not the property of Flynn or his business when he signed the stipulated judgment in the *Flynn* case in May 2002, and he was not authorized by Larsen Bakery to surrender its domain name. (DPSOF ¶ 109; Bolton Aff. Ex. 18; Hutchinson Decl. ¶ 64.) RDK's Heyer understood that Larsen Bakery owned the "racinekringle.com" domain name and that Flynn could not transfer it. (DPSOF ¶ 110; Bolton Aff. Ex. 4 at 64-65.)

RDK filed the present case on July 10, 2002, and served Larsen Bakery immediately with the summons and complaint in this case as well as the stipulated judgment and injunction entered in the *Flynn* case. (PPFOF ¶ 87; *see* Compl.)

Larsen Bakery continued to operate the website at racinekringle.com. (PPFOF ¶ 62; Himich Decl. filed 6/25/04 Ex. E at 109, Ex. G ¶ 16.) However, Flynn informed Larsen Bakery in June or July 2002 that he was no longer be able to host Larsen Bakery's website because of the settlement with RDK. (DPSOF ¶ 113; Hutchinson Decl. ¶ 50; Himich Decl. filed 6/25/04 Ex. G ¶ 16.) For a time after the issuance of the injunction, RacineOnline.com had its banner advertised on Larsen Bakery's website. (PPFOF ¶ 63; Himich Decl. filed 6/25/04 ¶¶ 8, Ex. E at 109, Ex. G ¶ 17.)

On or about August 12, 2002, Larsen Bakery contacted Daniel Nelson of Calderus Corporation to assist in a transfer of internet service providers from Flynn's internet service company, RacineOnline.com, to Calderus. (PPFOF ¶ 88; Himich Decl. filed 6/25/04 Ex. C at ADV 0072, Ex. E at 72; DPSOF ¶ 118; Hutchinson Decl. ¶ 52.) Webhosting of the

15

site moved to Calderus in about August 2002 (DPSOF ¶ 119, Def.'s Resp. to Pl.'s Proposed

Findings of Fact ¶ 63; Hutchinson Decl. ¶ 53), with completion on or about September 2, 2002

(PPFOF ¶ 89; Himich Decl. filed 6/25/04, Ex. C, Ex. E at 72).

When Calderus took over webhosting services for Larsen Bakery, Calderus

knew of the dispute between RDK and Flynn and the *Flynn* case, yet continued to host the

racinekringle.com website. (PPFOF ¶ 90; Himich Decl. filed 6/25/04 Ex. E at 72.) In or about

August 2003, RDK's attorneys contacted Calderus, informing Nelson of the injunction in the

*Flynn* litigation and threatening him with legal proceedings. (PPFOF ¶ 91; Def.'s Resp. to

Pl.'s Proposed Findings of Fact ¶ 91; Himich Decl. filed 6/25/04 Ex. E at 70, 73, 133;

Hutchinson Decl. ¶¶ 54-55; DPSOF ¶ 121.[7])

Until about August 2003, Larsen Bakery continued to advertise and offer for sale

pastries on the website racinekringle.com. (PPFOF ¶ 93; Himich Decl. filed 6/25/04 Ex. E at

70-71.) In August 2003, racinekringle.com was rendered inactive. (PPFOF ¶ 92; Himich

Decl. filed 6/25/04 Ex. E at 70, 73.) Larsen Bakery discontinued using the domain name

racinekringle.com while the present lawsuit was pending, to show Larsen Bakery's good faith

and to appease RDK, but not because it believes its position is weak or lacks merit. (DPSOF

¶¶ 122, 123; Hutchinson Decl. ¶ 56; Himich Decl. filed 6/25/04 Ex. E at 70-71, 73, 133.)

Larsen Bakery never performed a trademark search before beginning operation

of the website at racinekringle.com. (PPFOF ¶ 64; Himich Decl. filed 6/25/04 Ex. E at 12.)

Furthermore, it did not receive a formal legal opinion from counsel regarding the website

before adopting that domain name. (PPFOF ¶ 65; Himich Decl. filed 6/25/04 Ex. E at 15, Ex.

---

[7]RDK objects to this proposed finding of fact as hearsay, but statements by counsel for RDK
constitute admissions of a party-opponent.

16

H ¶ 6.)  After the dispute with RDK arose Larsen Bakery obtained an oral opinion from counsel, recommending that Larsen Bakery not use the domain name because litigation costs might be prohibitive.  (PPFOF ¶ 66; Himich Decl. filed 6/25/04 Ex. E at 127-28; Hutchinson Decl. ¶ 56.)  Nevertheless, Larsen Bakery chose not to follow the attorney's advice.  (PPFOF ¶ 67; Himich Decl. filed 6/25/04 Ex. E at 128.)

Larsen Bakery knew of RDK before registration of its domain name racinekringle.com.  (PPFOF ¶ 68; Himich Decl. filed 6/25/04, Ex. G ¶ 5.)  Also prior to adoption of its website, Larsen Bakery knew that RDK held the trademark RACINE DANISH KRINGLES and that goods produced by RDK bore that mark.  (PPFOF ¶¶ 69, 70; Himich Decl. filed 6/25/04 Ex. E at 45, 52, Ex. G ¶ 6.)  Moreover, Larsen Bakery advertises nationwide and sells its pastry products over the internet and outside of Wisconsin.  (PPFOF ¶¶ 73, 74; Himich Decl. filed 6/25/04 Ex. E at 131, Ex. G ¶¶ 23, 24.)

Larsen Bakery and RDK are competitors.  (PPFOF ¶ 77.)  Larsen Bakery's pastry products are priced comparably to the products of other bakers, except that Larsen Bakery's prices are lower than RDK's.  (PPFOF ¶ 76; Def.'s Resp. to Pl.'s Proposed Findings of Fact ¶ 76; Heyer Decl. ¶¶ 11, 15; Himich Decl. filed 6/25/04 Ex. E at 76, Ex. H ¶ 3.)  One Larsen Bakery kringle sells for $18.95 over the internet.  (PPFOF ¶ 78; Himich Decl. filed 6/25/04 Ex. E at 76.)  RDK's kringle sells for $21.50 over the internet.  (PPFOF ¶ 94; Heyer Decl. ¶ 15.)

As of October 2003, there were instances of actual confusion where orders were placed for "Racine Kringles" pastries by mistake with the wrong supplier.  (PPFOF ¶ 79; Heyer Decl. ¶¶ 24-27; Himich Decl. filed 6/25/04 Ex. E at 67-68, Ex. H.)  Customers have placed orders for pastries with Larsen Bakery via the internet and then called RDK to complain when

their orders were not received or when they found out they had ordered from Larsen Bakery. A Tim King phoned RDK after ordering from Larsen Bakery over the internet in late 2002 and not receiving his order; a second order was placed with RDK and King complained when billed twice. (*See* Heyer Decl. Ex. D.) A Richard Lavanture reported to RDK in January 2003 that he had ordered from RDK in 2001 but had accidentally ordered from Larsen Bakery at racinekringle.com the next year. (*Id.* Ex. E.) A Jim Boone called RDK looking for confirmation of shipment of his kringle in late 2002. The order confirmation that he faxed to RDK was a confirmation from Larsen Bakery's racinekringle.com. (*Id.* Ex. F.) Apparently, a Nicholas at Weststar Construction wanted to order from RDK in November 2001 but printed the order form from racinekringle.com and sent his order to Larsen Bakery instead. (*Id.* Ex. G.)[8]

Some customers refer to RDK as "Racine Kringles" and RDK's goods as "Racine Kringles." (PPFOF ¶ 82; Heyer Decl. ¶ 23.) Some customers pay RDK for their pastries with checks made payable to "Racine Kringles," mailed to RDK in envelopes addressed to "Racine Kringles." (PPFOF ¶ 83; Heyer Decl. ¶ 23.) Exhibit C to Heyer's Declaration includes what appear to be a few hundred checks written to "Racine Kringle," "Racine Kringles," "Racine Kringle Co." or "Racine Kringle Company." (Heyer Decl. Ex. C.)[9]

---

[8]RDK provides two additional complaints about lack of paperwork with an order and an order that arrived in an unsatisfactory condition, but the emailed complaints contain no proof that the cause of the problem related to Larsen's in anyway. The handwritten notation of "Larsen's" on the emails by some unidentified person could be pure speculation. (*See* Heyer Decl. Exs. H, I.)

[9]Neither of the parties presented an exact number of checks in Exhibit C, and the court has not counted them. However, the checks are numerous. (The court has not checked to make sure none of the pages in Exhibit C is a duplicate – that was for Larsen Bakery to determine.) In its reply brief, RDK puts the number at 400, but no affidavit of an attorney or other person regarding the count is presented. (*See* Pl.'s Reply at 10.) Although not substantial in number, some of the checks or payment slips included in Exhibit C do not support RDK's case, as they are made payable to "Kringle" alone, "Racine Danis [sic] Kringle," "Racine Danish," "Kringle - Danish," and "Kringles Racine Danish." One fax transmittal sheet included in Exhibit C refers to customers reciving "a famous 'Racine Kringle,'" with no clarification as to whether the writer meant the product in general or RDK'S product specifically. Further, one letter included in Exhibit C, written by an employee of Foley &

18

On the other hand, many of Larsen Bakery's customers actually come into the bakery and ask for "some of that Racine kringle." (DPSOF ¶ 32; Himich Decl. filed 6/25/04 Ex. E at 42.) An e-mail received by RDK itself, dated February 5, 2000, references "buying and eating Racine kringle for 33 years," predating RDK's existence by many years. (DPSOF ¶ 34; Bolton Aff. Ex. 14.) RDK's Heyer admits that this e-mail referencing "Racine kringle" thirty-three years ago could not have been referencing RDK'S particular brand, which did not yet exist. (DPSOF ¶ 35; Bolton Aff. Ex. 4 at 154-56.) Larsen Bakery's kringle order forms in 2002 (admissible as business records) allowed customers to state how they found Larsen Bakery's website. One customer indicated that he or she was specifically looking for Larsen Bakery but used a search engine for "racine kringle." (Bolton Aff. Ex. 17.)

Several internet sites refer to "Racine kringle" (or even RACINE DANISH KRINGLES) in a generic or descriptive sense. For instance, a message board regarding ex-patriots in Spain discusses "Racine Kringle from Lehman's." (Bolton Aff. Ex. 20.[10]) A forum on the roadfood.com website includes the statement that "Racine Danish kringles are baked daily" at O&H Danish Bakery, Lehmann's, Larsen's and Bendtsen's, plus the additional statement that "Racine Kringle [is] worth stopping for. Raspberry, nut flavors, it's all goooood." (*Id.*) A recipe-swap site indicates someone named Pat was looking for a recipe for "Racine Kringle." (*Id.*) A website about Racine County contained a link to "Bakeries with

---

Lardner, is actually addressed to "RACINE DANISH KRINGLES," but then later refers to the company as "Racine Kringle." It is possible that the second reference was a typographical error rather than a mix-up about the company's name. (*See* Heyer Decl. Ex. C at RDK 0082.)

[10]These internet references are not hearsay because they are not referenced for the truth of the matter asserted. Whether the people writing on the message board actually ate a twenty-four pound turkey or whether their guests brought them kringle from Lehmann's is not the point. The grammatical use of the term "Racine kringle" is what they exhibit. RDK contends that this evidence is also unauthenticated and lacks foundation, but counsel for Larsen Bakery states in his affidavit that he personally downloaded the exhibits from the internet, and, in addition, that copies from the books are true and correct. (Bolton Aff. ¶¶ 3, 4, 7-14, 23.)

Racine Kringle." (*Id.*)  And a website suggesting a food party using only Wisconsin products suggested including "Racine kringle, brats, sauerkraut, and Colby cheese." (*Id.*)  Someone apparently documenting a trip references going to the "'Mecca of Racine Kringle,' O&H Bakery." (Bolton Aff. Ex. 2.)

RDK's Heyer admits that to a lay person "Florida oranges" would connote oranges from Florida, and "California chardonnay" would connote wine from somewhere in California.  (DPSOF ¶ 50; Bolton Aff. Ex. 4 at 86-87.)  Heyer himself, if he knows the exact name of a company, will type in that company's exact business name when looking for its website.  (DPSOF ¶ 51; Bolton Aff. Ex. 4 at 87.)

In 1993 or 1994, RDK's Heyer complained to Larsen Bakery's Hutchinson about a fundraising brochure that included the three-word phrase "RACINE DANISH KRINGLE." (DPSOF ¶ 93; Hutchinson Decl. ¶ 37; Bolton Aff. Ex. 4 at 97-98.)  Larsen Bakery did not create or approve the fundraising brochure; the fund raising organization had prepared it. (DPSOF ¶ 94; Hutchinson Decl. ¶ 38.)  Heyer told Hutchinson at that time:  "Listen, Don, as long as you do not use those three words in a row, Racine Danish Kringle, that's my trademark name, then you can do whatever you want; but you cannot use those three words in a row."  (DPSOF ¶ 97; Himich Decl. filed 6/25/04 Ex. E at 17-18.[11])

LARSEN BAKERY IS NOT BOUND BY THE STIPULATED JUDGMENT

RDK argues that under Fed. R. Civ. P. 65(d) Larsen Bakery is bound by the injunction Magistrate Judge Callahan entered in case number 01-C-530, and is prohibited from using "racinekringle.com."

---

[11]RDK objects to this proposed finding of fact as hearsay, but it is an admission by a party-opponent.

Rule 65(d) derives from the common law doctrine that an injunction binds the named parties as well as "those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). Yet the scope of who must obey an injunction is circumscribed.

> "[N]o court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto burum fulmen,[12] and the persons enjoined are free to ignore it. It is not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court. Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party. This means that the respondent must either abet the defendant, or must be legally identified with him."

*Herrlein v. Kanakis*, 526 F.2d 252, 253-54 (7th Cir. 1975) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832-33 (2d Cir. 1930) (Hand, J.)).

Thus, pursuant to Rule 65(d), an "order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."

It is undisputed that Larsen Bakery received notice of the stipulated judgment on July 10, 2002. But it is also undisputed that Larsen Bakery was not a party nor an officer, servant, employee or attorney of a party to the case before Magistrate Judge Callahan.

---

[12]"Pro tanto brutum fulmen" means approximately "to such an extent an ineffective act or empty threat." Oxford English Dictionary Online, http://dictionary.oed.com/cgi ("brutum fulmen" and "pro tanto" visited 7/31/06).

Neither was Larsen Bakery an agent of Flynn or his company. Under Rule 65(d), an agent is bound by any injunction against his principal while acting in that capacity. *Pasco Int'l (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 501 (7th Cir. 1980). But Larsen Bakery *hired* Flynn to do its domain name registration and webhosting. As between the two parties, Larsen Bakery was the principal and Flynn was the agent, not the other way around. Rule 65(d) by its terms does not allow an injunction against a named agent to bar an unnamed principal from actions. *See Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 304 (2d Cir. 1999).

> An order forbidding the principal to do an act on her own would normally be understood to bar the principal's servants or agents from doing the act for the principal's benefit. It is quite different for an injunction against an agent or servant also to bind the principal. By definition, the servant does not control the principal. If the court does not have jurisdiction over the principal, it is not easy to see why the court should have the power to bind her through an order directed against her.

*Id.*

Therefore, the question is whether Larsen Bakery was a person in active concert or participation with Flynn. A nonparty is considered to be in active concert or participation with a party when (1) it is a successor in interest to the party named in the injunction with respect to the subject matter of the injunction, or (2) when it aids or abets the named party in a concerted attempt to subvert the injunction's proscriptions. *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 91 F.3d 914, 919 (7th Cir. 1996); *Herrlein*, 526 F.2d at 254; *Good Earth Lighting, Inc. v. New Chao Feng Indus. Co.*, No. 98-C-1442, 1999 WL 58555, *2 (N.D. Ill. Feb. 3, 1999). The active concert or participation clause is designed to prevent the addressee of

an injunction from persuading a friendly third party to take steps that frustrate the injunction's effectiveness. *Lindland v. U.S. Wrestling Ass'n*, 227 F.3d 1000, 1006 (7th Cir. 2000).

"[A]llow[ing] a named party to avoid an injunction through the transfer of assets would provide an easy method of defying court orders." *Herrlein*, 526 F.2d at 255. But a successor in interest may be liable for violating an injunction against the predecessor in interest only when the succession transfer was made after the injunction issued. *Id.* at 254-55. In *Herrlein*, a company named Mogul Corporation purchased the assets of Teklad, Inc. on January 18, 1973, and hired Teklad's owner, Thomas Kanakis, to manage the assets. *Id.* at 252. On February 20, 1973, Alice Herrlein sued Kanakis and Teklad for breach of contract and impairment of her rights to certain formulas. *Id.* at 253. Mogul was never a party to the case. On February 4, 1974, the court issued an injunction against Kanakis and Teklad. Thereafter, Herrlein served a copy of the injunction on and sought to enforce the injunction against Mogul. *Id.* The Seventh Circuit held that the district court lacked authority to enforce the injunction against Mogul. *Id.* Mogul was not considered a successor in interest because the transfer of assets from the named parties to Mogul occurred *before* the lawsuit against the named parties was even initiated and thus could not have been undertaken to defy the court's order. *Id.* at 254-55.[13] The court noted that Herrlein had the option at the time she filed suit to join Mogul as a party but did not. *Id.* at 255.

Here, it is undisputed that any transfer of the domain name, even assuming that a transfer of the domain name between Flynn and Larsen Bakery occurred (rather than an original registration in Larsen Bakery's name), took place before RDK sued Flynn. Thus, the

---

[13]Further, the court found that the named parties had not been found in violation of the injunction, so Mogul could not have aided or abetted them in violating the injunction. *Id.* at 254.

transaction could not have been undertaken to defy any court injunction and, like Mogul in *Herrlein*, Larsen Bakery cannot be considered a successor in interest against whom the injunction can be enforced.

Further, the undisputed evidence fails to establish that Larsen Bakery aided or abetted Flynn in a concerted attempt to subvert the injunction's proscriptions. The key point is the requirement that, to be included within the scope of Rule 65(d), Larsen Bakery must have attempted to help the named party evade the injunction. The purpose of the active concert or participation clause is to prevent the named party from persuading a third party to take steps that frustrate the injunction's effectiveness. *Lindland*, 227 F.3d at 1006; *see also Good Earth Lighting*, 1999 WL 58555 at *2 (stating that customers of a named party can be enjoined from selling goods purchased from the named party only if the customers knew that the named party was enjoined from selling to them and they tried to help the named party evade the injunction).

No evidence presented by RDK indicates that Larsen Bakery in any way *helped* Flynn evade Magistrate Judge Callahan's injunction or that *Flynn* persuaded *Larsen Bakery* to take any steps to frustrate the injunction. Undisputed evidence indicates that shortly after notice of the injunction, Larsen Bakery sought to transfer webhosting to Calderus and that such transfer occurred within a couple of months.[14] It appears that if Flynn violated the injunction for a couple of months it was Flynn's choice to do so. No evidence indicates that Flynn needed Larsen Bakery's help in running the website. No evidence has been presented

---

[14]RDK's argument that together Larsen Bakery and Calderus violated the injunction from September 2002 to July or August 2003 by running the website through Calderus (*see* Pl.'s Reply at 13) is frivolous. Once webhosting was transferred to Calderus, Larsen Bakery and Calderus could not have been aiding or abetting Flynn in hosting the website in violation of the injunction, as Flynn was not longer hosting the website.

24

showing that Flynn could not have stopped webhosting the website immediately on the issuance of the injunction or that Larsen Bakery had any control over whether Flynn turned the website off. Larsen Bakery was Flynn's customer, and the evidence fails to show that Flynn, as seller of his services, was compelled by Larsen Bakery to sell such services in violation of the injunction. As seller, Flynn was in control; Larsen Bakery did not control him. *Cf. Reliance Ins. Co. v. Mast Constr. Co.*, 84 F.3d 372, 377 (10th Cir. 1996) (discussing possible aiding and abetting by a bank in customer's fund transfers in violation of an injunction and stating that customer could not have completed the transaction without the aid and assistance of the bank and bank could easily have refused customer's requested transactions).

The mere fact of a master/servant or principal/agent relationship, without more, is insufficient to establish that persons were in active concert for purposes of Rule 65(d). *Doctor's Assocs., Inc.*, 191 F.3d at 304 n.5.

Moreover, in determining the propriety of injunctions binding nonparties, both the Seventh and Second Circuits have considered the ease with which nonparties could have been bound. The Second Circuit noted its concern about avoidance of traditional process and judgment where traditional methods of binding particular nonparties were easily available. *Id.* at 305. In the case before the Second Circuit, Doctor's Associates simply could have sued the nonparties; their identities were known and jurisdiction over them could have been obtained easily. *Id.* Thus, the court saw "no reason to short-circuit the traditional avenues of directly serving the appellants with process or covering them by a class action in order to bind them." *Id.* In *Herrlein*, as mentioned above, the Seventh Circuit noted that Herrlein had the option at the time she filed suit to join Mogul as a defendant but did not. 526 F.2d at 255.

25

Here, RDK could have sued Larsen Bakery in the *Flynn* case with no difficulty. RDK knew who owned the racinekringle.com domain name and website and it should not be allowed to short-circuit so easily the traditional avenues of formal suit, service of process, and a defense by Larsen Bakery.[15]

No factual questions exist on this issue, and the court sees no reason to delay a final decision on the issue nothwithstanding that Larsen Bakery did not file a cross-motion for summary judgment. *See Spitz v. United States*, 432 F. Supp. 148, 150 (E.D. Wis. 1977) ("Although the plaintiffs have not moved for summary judgment . . . a court may grant summary judgment to a nonmoving party when it appears from the record that there is no factual dispute and the nonmovant is entitled to summary judgment as a matter of law."). Therefore, summary judgment on this issue will be granted in Larsen Bakery's favor.

TRADEMARK ISSUES

RDK sues Larsen Bakery for trademark infringement under 15 U.S.C. § 1114 and for unfair competition under 15 U.S.C. § 1125(a). RDK believes that the facts are undisputed and that it wins as a matter of law. It concedes that analysis of its state common law trademark claim is the same as that under federal law. (Pl.'s Mem. in Supp. at 37.) Thus, the federal and state claims will be discussed together using only federal law.

A.     Question of Fact Regarding Common Law Trademark "Racine Kringle"

RDK owns the indisputable registered trademark RACINE DANISH KRINGLE, but it sues Larsen Bakery for use of "racinekringle.com." RDK does not own any registered

---

[15]RDK contends that Larsen Bakery knew about the *Flynn* case and could have joined in as a defendant. The court finds farfetched the notion that an entity would voluntarily make itself a defendant in a case. It was RDK's responsibility as plaintiff in the *Flynn* case to sue the parties it wished to be bound by any injunction and judgment.

trademark for "Racine Kringle." Instead, it contends that it holds a common law trademark in that name.

Infringement of unregistered marks is actionable under § 1125(a)(1), which provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
>> (A) is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .
> shall be liable in a civil action . . . .

*See also Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 435 (7th Cir. 1999). Such a claim requires a showing that: (1) RDK has a protectable trademark; and (2) a "likelihood of confusion" will exist as to the origin of the defendant's products. *Id.* at 436; *accord Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002).

Generally, a party acquires a protectable right in a trademark only through use of the mark in connection with its product. *Id.* at 433. Here, RDK admits that it does not use "Racine Kringle" to identify its product.

However, abbreviations and nicknames of trademarks used only by the public give rise to protectable rights in the owners of the mark that the public modified. *Id.* at 434. Such public use of the nickname mark is deemed to be on behalf of those owners. *Id.* In some circumstances, parties have been found to possess rights in an alteration of an existing mark, which was used by third parties. *Id.*

27

Whether RDK has a common law trademark in the nickname "Racine Kringle" is a question of fact. RDK presents evidence that its trademark, with design, emphasizes the words "Racine" and "Kringle" in larger font, while the word "Danish" seems to recede because of its smaller font. In addition, a few of RDK's customers have sent RDK checks made out to "Racine Kringle" or have addressed envelopes to RDK with the name "Racine Kringle." Further, RDK presents evidence that some persons buying kringle off of the Larsen Bakery's racinekringle.com website later complained to RDK about the product they received or failed to receive, suggesting that those customers of Larsen Bakery actually thought "racinekringle" meant RACINE DANISH KRINGLES.

However, Larsen Bakery presents substantial opposing evidence that "Racine Kringle" is *not* always, or even usually, used as a nickname for RDK or RACINE DANISH KRINGLES. For instance, Larsen Bakery presents evidence that a customer of RDK referred to buying "Racine Kringle" for over thirty-three years – with the start of that time period predating the existence of RDK itself, suggesting that "Racine Kringle" means kringle from Racine rather than RDK or its trademark. Several internet references show public use of "Racine kringle" as meaning the product made by any of O&H Danish Bakery, Lehmann's, Larsen Bakery, and Bendtsen's. The person seeking the recipe for "Racine Kringle" was referencing the product, not RDK. Further, Larsen Bakery presents extensive evidence regarding the historical ties between Racine and the pastry known as kringle, again suggesting that the combination of "Racine" and "kringle" describes the product made by any of the bakeries in Racine rather than solely RDK's product.

Trademark law recognizes five categories of trademarks, in ascending order of distinctiveness or strength: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5)

fanciful. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 684 (7th Cir. 2001); *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). The Lanham Act grants broader protection to those marks with a higher degree of distinctiveness. *TCPIP Holding Co. v. Haar Commc'ns Inc.*, 244 F.3d 88, 94 (2d Cir. 2001). Generic terms, however, are entitled to no trademark protection at all. *Mil-Mar Shoe Co.*, 75 F.3d at 1156.

A generic term is one that is commonly used to name or designate a kind of goods. *Id.* at 1157; *see Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 140 (4th Cir. 2000). It "refers to the genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985). No manufacturer can take out of the public language a word (or combination of words) with generic meaning as to a category of products and appropriate it for its own trademark use. *See Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir. 1999). Nor can the public, in creating a nickname, withdraw from the language a generic term, already applicable to a category of products, and accord it trademark significance for one manufacturer, as long as the term retains some generic meaning. *See id.* at 812 & n.12. For instance, in *Harley-Davidson*, the court found that "hog" was a generic term for a large motorcycle long before Harley-Davidson and the public used the term to refer specifically to Harley-Davidson motorcycles, and, therefore, it was a generic term.

Geographically descriptive terms are placed in the same category as descriptive terms, i.e., terms that describe some quality or feature of goods; they are not inherently distinctive and can be protected as trademarks only if they have acquired secondary meaning. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 14:1 (4th ed.

2006).   A geographically descriptive term is any noun or adjective that designates geographical location and tend to be regarded by consumers as describing the geographic origin of a good.  *Id.* § 14:2.  If a geographic term is used merely to indicate the location or origin of goods it cannot, without more, be used to identify one person's goods or distinguish them from goods sold by others in the same locality.  *Id.* § 14:1.  If a mark is the name of the place from which the good actually comes, it is probably used in the descriptive sense, and secondary meaning is required for protection.  *Id.* § 14:7.  Secondary meaning indicates that customers have come to use a geographically descriptive word in a new (secondary) sense of denoting only one source of goods.  *Id.* § 14:9.[16]

Thus, if "Racine Kringle" was generic before RDK's existence or its customers' use of the term and it retains its generic meaning, RDK cannot acquire a trademark in the phrase at all.  When a mark claimed as a trademark is not federally registered – and "Racine Kringle" is not – the burden is on the claimant, here RDK, to establish that it is not a generic, unprotectable mark.  *See Mil-Mar Shoe Co.*, 75 F.3d at 1156.  The question whether a term is the name of a product and thus generic is a question of fact.  *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).  The court looks to whether consumers understand the word to refer only to a particular producer's goods or to the goods themselves.  *KP Permanent Make-Up, Inc.*, 408 F.3d at 604.  If a term is identified with all such goods, regardless of supplier, the term is generic.  *Id.*  In determining whether a term is generic,

---

[16]Prior to obtaining secondary meaning there can be no likelihood of confusion, as customers take the geographic term as descriptive of the origin of the goods rather than indicative of a single seller.  *Id.*

consumer perceptions are important. *Cal. Cooler, Inc. v. Loretto Winery, Inc.*, 774 F.2d 1451, 1455 (9th Cir. 1985).[17]

Similarly, if "Racine Kringle" is a geographically descriptive mark, it cannot, without more, be distinctive enough to identify a particular seller or distinguish its goods from those of others; the geographical term simply describes a good emanating from a certain geographical location. McCarthy, *supra*, § 14:1. RDK would have to show secondary meaning – i.e., that the term "Racine Kringle" has acquired a distinctive meaning for RDK-produced products only. *See id.*

Larsen Bakery has presented an abundance of evidence that "kringle" is a generic term for the pastry made by several bakeries in Racine. Thus, that term on its own can be considered generic for present purposes. And RDK cannot possibly claim exclusive use of the geographic location "Racine" alone.

"[T]he genericness of composite terms must be evaluated by looking at the term as a whole." *Mil-Mar Shoe Co.*, 75 F.3d at 1161; *see TE-TA-MA Truth Found.–Family of URI, Inc. v. World Church of Creator*, 297 F.3d 662, 666 (7th Cir. 2002) (indicating that a phrase must be deemed generic as a unit rather than word by word). "Apple computers," for instance, is a trademark even though each word separately would be generic. *Mil-Mar Shoe*

---

[17]Larsen Bakery raised the issue of genericness of "Racine Kringle" in its opposition brief. In reply, RDK argues that Larsen Bakery has raised only an affirmative defense and thus has admitted infringement. (Pl.'s Reply at 3-4 & nn. 4, 5.) Regardless of whether genericness is also an affirmative defense, the question at present is whether RDK has any protectable trademark in "Racine Kringle." A protectable trademark is an element of RDK's claim, which RDK must establish. Thus, in the present posture Larsen Bakery is raising genericness regarding an element of RDK's claim rather than as an affirmative defense.

Similarly, RDK's assertion in its reply brief that Larsen Bakery has merely raised the affirmative defenses of fair use and estoppel and failed to prove them is incorrect. The facts RDK contends related to supposed affirmative defenses of fair use and estoppel were raised by Larsen regarding its intent in using the racinekringle.com domain name. Such intent is the seventh element in the likelihood of confusion test, and, therefore, again relates to the elements of RDK's case rather than an affirmative defense.

Case 2:02-cv-00675-CNC   Filed 07/31/06   Page 31 of 40   Document 44

*Co.*, 75 F.3d at 1161 n.15. Similarly, "California Cooler" was demonstrated to be considered a reference to a brand of wine cooler rather than the product itself. *Cal. Cooler, Inc.*, 774 F.2d at 1456. However, some composite terms are nothing more than the sum of their parts. *Mil-Mar Shoe Co.*, 75 F.3d at 1161. Examples of generic composite terms include: "light beer," "multistate bar examination," "Warehouse Shoes," and "ale house." *Id.*; *Ale House Mgmt., Inc.*, 205 F.3d at 141. Even as a unit, each of those composite terms remains generic.

Regarding the composite term "Racine Kringle," the evidence of the RDK customer's reference to "Racine Kringle," the public use of "Racine Kringle" on the internet to reference kringle made by any of several bakeries, as well as the history linking Racine with kringle indicate that at the very least a question of fact exists as to whether "Racine Kringle" is generic, referring to the product itself. If the line between generic and descriptive appears indistinct, a useful question is whether one firm's exclusive use of the phrase will prevent a rival from describing its product. *Te-Ta-Ma Found.*, 297 F.3d at 666-67. Here, a reasonable fact-finder could determine based on the evidence of Danish immigrants coming to Racine and making kringle in bakeries, changing the pretzel shape to an oval, and creating a wider variety of fillings, that "Racine Kringle" describes the product and that allowing RDK exclusively to use the phrase would prevent rival bakeries from describing their products. The evidence suggests that at least several consumers view "Racine Kringle" as the product rather than a brand name.[18]

---

[18]In its trademark registration certificate for RACINE DANISH KRINGLES RDK disclaimed any right to "Danish kringles." It offers no persuasive argument for finding a right in "Racine Kringles" when there is no right in "Danish kringles." Although RDK contends that the first and last words of its trademark form a longer-lasting impression than the middle word, and that the trademark with design emphasizes "Racine" and "Kringles," the court is not persuaded.

Similarly, for the same reasons, even if "Racine Kringle" may be considered geographically descriptive rather than generic, a question of fact exists as to secondary meaning. A dispute exists as to whether the public views "Racine Kringle" to be a description of the geographic origin of the kringle product as opposed to only RDK's product.

B.     Question of Fact Regarding Likelihood of Confusion with Registered Trademark

RDK holds an indisputable registered trademark in RACINE DANISH KRINGLES. Registration under the Lanham Act affords the registrant a rebuttable presumption of validity. *Promatek Indus., Ltd.*, 300 F.3d at 812; *CAE, Inc.*, 267 F.3d at 673. To be registered, a mark must be capable of distinguishing the applicant's goods or services from those of others and must have been used in interstate commerce. *Id.*

Registered trademarks can be enforced under 15 U.S.C. § 1114(1)(a)[19] as well as § 1125(a). But to prevail on either claim, a plaintiff must establish the same elements as mentioned above: (1) that it has a protectable trademark; and (2) that defendant's use of the mark is likely to cause confusion among customers. *CAE, Inc.*, 267 F.3d at 673-74.

It is undisputed that RDK has a registered trademark in RACINE DANISH KRINGLES, but a question remains whether the holder of a legitimate trademark can "enjoin the use of a similar term that is likely to be confused with the trademark if the similar term is itself generic." *Mil-Mar Shoe Co.*, 75 F.3d at 1160. Noting the conflict between the fundamental principles of trademark law that a trademark holder can protect its mark and the public can use generic terms in their generic sense, the Seventh Circuit has identified but

---

[19]Section 1114(1)(a) allows the holder of a registered trademark to hold liable any person who without consent, "use[s] in commerce any . . . registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services," which is likely to cause confusion.

33

declined to answer the question. *Id.* RDK will have to prevail on this issue to win its case regarding infringement of RACINE DANISH KRINGLES. However, for present purposes only, this court will assume that "Racine Kringle" is not generic or that RDK can protect its trademark by blocking use of a generic phrase. Thus, the court will continue on to the second element: likelihood of confusion.

Whether consumers are likely to be confused about the origin of a company's products is a question of fact. *CAE, Inc.*, 267 F.3d at 677. Nevertheless, whether a likelihood of confusion exists can be resolved on summary judgment "'if the evidence is so one-sided that there can be no doubt about how the question should be answered.'" *Id.* (quoting *Door Sys., Inc.*, 83 F.3d at 173). However, a finding of likelihood of confusion requires that confusion be probable, not just a possibility. *See KP Permanent Make-Up, Inc.*, 408 F.3d at 608. Due to the factual nature of likelihood of confusion, a determination that it exists at the summary judgment stage is generally disfavored. *Id.*

The likelihood-of-confusion test is an equitable balancing test analyzing seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" its product as that of the plaintiff. *Promatek Indus., Ltd.*, 300 F.3d at 812; *CAE, Inc.*, 267 F.3d at 677-78. No single factor is dispositive and the weight of each factor depends on the circumstances. *Promatek Indus., Ltd.*, 300 F.3d at 812; *CAE, Inc.*, 267 F.3d at 678. However, in many cases, factors (1), (6), and (7) are most important. *Promatek Indus., Ltd.*, 300 F.3d at 812; *CAE, Inc.*, 267 F.3d at 678.

Some of these factors weigh in RDK's favor. First, the products at issue are extremely similar. It is not as if one party sells hot dog buns and the other kringles. Both sell kringles made in the manner that the descendants of Danish immigrants located in Racine, Wisconsin, make: flaky pastry shaped in ovals, filled with various fillings. Related goods are generally more likely than unrelated goods to confuse the public regarding who produces the goods. *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999). Second, the area and manner of concurrent use are the same. This factor assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *CAE, Inc.*, 267 F.3d at 681. RDK and Larsen Bakery are selling kringles over the internet to the same audience. And use of the internet as a marketing facility has been suggested as exacerbating confusion. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1057. Web surfers are more likely to be confused regarding the ownership of a website than traditional customers of physical stores. *Id.* Third, the degree of care likely to be exercised by consumers is low. "The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683. Also, the more sophisticated the consumer, generally the less likely he or she will be misled by similarity in marks. *TCPIP Holding Co.*, 244 F.3d at 102. Here, inasmuch as consumers are purchasing pastry over the internet and are paying approximately twenty-dollars, do not need to be sophisticated and the court, assumes the degree of care is very low. However, the remaining factors, three of which are usually the most important, are a toss-up or weigh in Larsen Bakery's favor.

Importantly, the mark RACINE DANISH KRINGLES and racinekringle.com are not identical. Although the difference between the plural trademark and the singular domain

name is insubstantial, the terms differ in an important way by the absence of "Danish" in the latter.[20] The absence of the word "Danish" makes the two-word domain name quite different than the three-word registered trademark.

The strength of a trademark "refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *CAE, Inc.*, 267 F.3d at 684. As stated above, trademark law recognizes the following categories of protected trademarks, in ascending order of distinctiveness or strength: descriptive, suggestive, arbitrary, and fanciful. *Id.*; *Mil-Mar Shoe Co.*, 75 F.3d at 1156. The Lanham Act grants broader protection to those marks with a higher degree of distinctiveness. *TCPIP Holding Co.*, 244 F.3d at 94. But for purposes of the present test, the strength of the mark relates to the likelihood of confusion as well.

Even so, the incontestability of a registered trademark does not enhance its strength. Incontestability of a registered trademark reflects validity; for instance, incontestability means that a descriptive mark is presumed to have acquired secondary meaning. *KP Permanent Make-Up, Inc.*, 408 F.3d at 606. The validity of a mark and a mark's strength for purposes of the likelihood of confusion test are two separate inquiries. *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 n.3 (4th Cir. 2006); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002); *see Munters Corp. v. Matsui Am., Inc.*, 909 F.2d 250, 252 (7th Cir. 1990). Incontestable status means the mark is not generic and

---

[20]Differences of the separate words running together and the top-level domain identifier of ".com" have little to no significance regarding the trademark infringement of internet addresses, as an internet address requires elimination of spaces and the addition of such a domain identifier at the end of the address. *TCPIP Holding Co.*, 244 F.3d at 101; *Brookfield Commc'ns, Inc.*, 174 F.3d at 1055. For instance, consumers see the domain name "thechildrensplace.com" as employing functionally the same name as "The Children's Place." *TCPIP Holding Co.*, 244 F.3d at 101.

that, if descriptive, secondary meaning has been established; strength analysis for the likelihood-of-confusion test is a different inquiry.

A trademark that particularizes its product or service, by identifying the ingredients, qualities, or characteristics of the product or service, is "descriptive." *TCPIP Holding Co.*, 244 F.3d at 93; *Mil-Mar Shoe Co.*, 75 F.3d at 1157. For instance, "Children's Place" as used to describe a place that sells children's merchandise is a "highly descriptive" mark. *TCPIP Holding Co.*, 244 F.3d at 93. As noted above, descriptive marks often assert geographical identity, such as "American Airlines" or "Metropolitan Life." *Id.* at 96 & n.8.

Descriptive marks are considered weak under trademark law. *Id.* at 93. They are generally disfavored because their enforcement tends to deprive others of the opportunity to use proper descriptions of their products. *Id.* at 95. Further, the more descriptive the mark is of the goods, the less likely a consumer will assume that a similar mark used on goods came from the same source. *Id.* at 100-01.

Evidence suggests that under this legal standard, RACINE DANISH KRINGLES may be only a descriptive mark that has acquired secondary meaning, or at least a fact-finder could reasonably so determine.[21] It describes the kringle as made by Danish immigrants and their successors in Racine, Wisconsin. Therefore, a reasonable jury could find that it is a weak mark under trademark law. Hence, this factor weighs in Larsen Bakery's favor.[22]

---

[21]To be trademarkable, a descriptive name must have secondary meaning. *See* McCarthy, *supra*, § 14:7. That the mark RACINE DANISH KRINGLES is incontestable means that it may be enforced without proof of secondary meaning even if it is a descriptive name for the qualities or characteristics of a good or service. *Te-Ta-Ma Truth Found.*, 297 F.3d at 664.

[22]A "suggestive" mark conveys the impression of a good but requires the exercise of some imagination to reach a conclusion as to the product's nature. *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 905 n.1 (9th Cir. 2003). At trial RDK may argue that its RACINE DANISH KRINGLES mark is suggestive. For present summary judgment purposes, what is important is that the evidence, read in favor of Larsen Bakery, supports a finding of descriptiveness as well.

Evidence of actual confusion, if available, is entitled to substantial weight in this analysis. *CAE, Inc.*, 267 F.3d at 685. And even one instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion. *Id.* at 686. However, the Seventh Circuit has also suggested that in some circumstances the confusion of two customers out of thousands cannot by itself establish a likelihood of confusion. *Door Sys., Inc.*, 83 F.3d at 173. Here, whether actual confusion exists is a question of fact. RDK points to envelopes and checks written to "Racine Kringle," but does not prove that any such confusion on the part of customers arises from or has any relation to Larsen Bakery's use of "racinekringle.com." The incorrect names on checks could be attributed to lack of care by the customers rather than any confusion between "Racine Kringle" and RACINE DANISH KRINGLES, as suggested by the checks also written to "Kringle," "Racine Danish," and "Kringles Racine Danish." Further, it is unclear exactly how many customers have been confused, although RDK provides a few hundred checks, including some from repeat customers. As noted earlier, the court has not counted the checks nor the number of customers writing checks to "Racine Kringle." And the proportion of these customers to all of RDK'S customers has not been established. Moreover, there is plenty of evidence suggesting no confusion on the part of many customers. For instance, a purchaser of Larsen Bakery's kringle sought Larsen Bakery's product specifically by searching for "racine kringle." Thus, there is a question of fact.

Finally, there is conflicting evidence regarding whether Larsen Bakery intentionally sought to palm its product off as RDK's. Larsen Bakery is more than thirty-seven years old, with an established-enough business that it appeared on Al Roker's cable television show. RDK is the newcomer to the kringle business. Further, Larsen Bakery believes its

product is better than RDK's.  If it is better, there would be no need to palm the Larsen Bakery product off as someone else's.  In addition, Larsen Bakery operates a full-service bakery carrying more than kringle alone, suggesting that it would not seek to palm off its several items as those of a company focusing mainly on kringle.  Hutchinson swears that Larsen Bakery chose the domain name "racinekringle.com" because of its connection to the community and the famous kringles that the area bakers, including Larsen Bakery, sold.  (DPSOF ¶ 76; Hutchinson Decl. ¶ 26.)  Further, he had been told by Heyer only that RDK objected to the three-word phrase RACINE DANISH KRINGLES.

RDK contends that Larsen Bakery knew of its trademark and "the registration of a domain name containing RDK's trade name strongly suggests an intent to confuse." (Pl.'s Mem. in Supp. at 27; Pl.'s Reply at 4.)  If Larsen Bakery had used racinedanishkringle.com RDK would have a point.  But "Racine Kringle" is *not* RDK's registered trademark, thus Larsen Bakery's use of the term does not suggest an intent to infringe.  Further, RDK argues that improper intent should be found in Larsen Bakery's failure to do a trademark search.  But Larsen Bakery already knew about RDK's registered trademark, i.e., RACINE DANISH KRINGLES, and, according to Hutchinson, had been told by Heyer that RDK's trademark included all three words in that order.  So, no improper intent can be gleaned from failing to run a trademark search that would have provided no additional information.  And while RDK seeks to attribute improper motive to Larsen Bakery's decision to disregard for an oral legal opinion, Hutchinson indicates that the opinion was based on the cost of fighting RDK rather than RDK's legal right to "Racine Kringle."  Finally, RDK argues that Larsen Bakery exhibited bad faith in "continuously flout[ing] this Court's order" (Pl.'s Reply at 5) for thirteen months by using the racinekringle.com website until August 2003.  However,

no bad faith can be inferred from Larsen Bakery's failure to adhere to an injunction to which it was not bound, as discussed above.

CONCLUSION

For the foregoing reasons,

IT IS ORDERED that RDK's motion for summary judgment is denied.

IT IS ORDERED that summary judgment is granted in Larsen Bakery's favor on the claim that Larsen Bakery violated the injunction in the *Flynn* case.

IT IS ORDERED that a scheduling and status conference is set for **September 1, 2006, at 11:00 a.m.** in Courtroom 222, U. S. Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, at which time the court will set dates for a final pretrial conference and for trial.

Dated at Milwaukee, Wisconsin, this 31st day of July, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge